24-5058 Manning v. City of Tulsa 2017-2018  May I Please the Court, Karen Portlock, on behalf of the appellant, the Aestete of Therence Crutcher. Your Honor, the District Court erred in granting qualified immunity to Police Officer Betty Shelby at the summary judgment stage for shooting and killing Terence Crutcher when the facts viewed in light most favorable to the estate established that Mr. Crutcher was unarmed and posed no risk to any person at the time Officer Shelby decided to shoot him. The District Court's analysis at the summary judgment stage was fundamentally flawed because the District Court did not view the facts in the light most favorable to the estate and it was required to do so when the estate was the non-movement. Instead, it recognized the existence of multiple disputed facts and did not resolve those facts in favor of the estate and it disregarded those facts to our detriment. The facts viewed in the light most favorable to the estate are tragically simple, Your Honors. The facts are that Terence Crutcher was shot with his hands up when he posed no threat to any person and, in fact, Officer Betty Shelby... At most, that's a disputed fact, right? Yes, Your Honor, it's clearly a dispute. The video shows from our view of the evidence that Mr. Crutcher had his hands up when he was shot, but we also have evidence we've pointed to in the record that Officer Shelby encountered the vehicle before she encountered Mr. Crutcher. She would have assessed the height of the window, which shows that it's nearly closed, and so Mr. Crutcher wouldn't have been able to access anything inside that vehicle. And furthermore, she testified she did not see a gun in the car. So her justification for her actions that she believed Mr. Crutcher was going to reach for a gun cannot stand on the view of the evidence taken in the light most favorable to the estate. We have evidence viewed in our favor that shows that she shot and killed Mr. Crutcher when she knew he could not arm himself and he posed no threat to her or anyone else. What do we do with the still frame from the helicopter that, you know, when you look at it, it does appear that his left hand has come down? They focus on it on the brief quite a bit, so I hope you know which one I'm, I think it's, I want to say 1-0-0-3-10, anyway, that frame, what do we do with that? Yes, Your Honor, well that frame was actually taken three seconds after the parties agree that the shot was fired, and so they're trying to draw an inference in their favor on the basis of a still photograph that was taken after Mr. Crutcher was shot. We would direct the court to another photograph, specifically we would direct the court to the appendix at page 434, and also in our reply brief we show this photograph, which shows that Mr. Crutcher, first of all, Mr. Crutcher was shot with his right arm raised, we have that, he was shot underneath into his right armpit, and we also have in this photograph that he fell with both arms above his head, and the photograph shows that the window was substantially raised and streaked with blood after he was shot and killed. And to Your Honor's question, even if the video can be construed to show that he might have lowered his arms, and we would dispute that, Your Honor, that would not provide justification for Officer Shelby to shoot and kill Terrence Crutcher when she looked in that car and she saw no gun in that car. Well, I mean, I think her testimony was that she looked in the car to see if there was anybody in the car. I mean, she didn't search the car for firearms. So, you know, I mean, these cases are always extremely difficult in terms of trying to put yourself in the position of the officer on the scene trying to know what's going on. And while I do agree she walked over there and she looked in to see if anyone was in the car, I'm not sure how much we can take from that in terms of resolving factual issues one way or the other. I take Your Honor's point, but I would direct the court to its authority, for example, in the Ortega case. That's a recent case, 128F4-1298, where the court states, we have instructed courts to be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict the testimony, the person shot dead and unable to testify, and also to not simply accept what may be a self-serving account from the officer. So, respectfully, Your Honor. And I accept that, but I also don't think we can infer resolution of factual issues based on speculation about what the officer saw or didn't see when she looked into the car to see if someone was in it. Well, Your Honor, absolutely, I respect that. I would, again, just point the court to the statements in the cases that the court should look at the circumstantial evidence to discredit the officer's statement. And so, from our perspective, she's trying to downplay the significance of that testimony or of her statement saying, I wasn't actually looking for weapons. But I think an inference can be drawn in our favor that she was. But regardless, she also encountered the window, and it was rolled up much too high for Mr. Crutcher to reach anything inside. And that is a fair view of the evidence in our favor. Let me ask you about your Minnell claim. Why would the city be liable here? Your Honor, what we've alleged on Monell is that there is a custom and practice at the Tulsa Police Department of which the city was aware that encouraged the excessive use of force in situations where it wasn't warranted. Don't you have to be more specific than that? Are you saying this is absence of training or improper training? And then you need to point to something specific, and I don't see it in the complaint, about how they're trained or what they didn't train and why that would have made a difference in this case. Well, we have included a lot of allegations in the complaint about how training was needed and TPD was on notice of that and didn't take action. You can't just say you needed training. You needed to say some specific thing that the officer was not trained on and why that would have made a difference in this case. And that I just don't see in the complaint. It's much too vague, much too generalized to base a claim against the city on, from what I can tell. But I'm asking this question so you can point to something that I'm missing. Yes, Your Honor. Well, specifically what we've alleged is the existence of a custom and practice. The city's knowledge that more training was needed on implicit bias. Okay, so what would implicit bias training have done in this circumstance? Implicit bias training, Your Honor, we allege in the complaint was needed based on the racial disparity in policing in Tulsa. What specific part of implicit bias training, if given to this officer, would have made a difference in this case? Isn't that what you have to allege? I mean, let's start with that. As far as I know, that is what you have to allege. And you haven't alleged that. You can't just say they needed implicit bias training. They needed to be taught not to be racist. They needed to be taught, don't fire too quickly, you know, be more patient. But it's hard to see in your complaint a specific matter that they were not trained on, that the officer was not trained on, that would have prevented this from happening. Your Honor, I appreciate the question. Our position is, as alleged, that the city was on notice of an overall custom of officers using excessive force unnecessarily. So that was established by the fact, we've alleged, because they were aware that there were incidents of excessive force that were not adequately investigated. The city failed to discipline officers, failed to hold them accountable, was aware of racial disparities in policing. No specifics, not one specific incident was mentioned, was alleged in your complaint. Well, obviously, we speak to the circumstances of the killing of Terrence Crutcher. And so... No, no, but the city had to be on notice before this happened, that they needed to train. They needed to, you need to establish that there was improper police conduct, that the city was aware of, and did not properly respond. I don't see that. Let me get off that, because I don't think we're getting anywhere on that. Are there any other grounds for the city being liable in this case that you're raising? Yes, Your Honor. Again, our Monell claim rests on the existence of a customer practice that tolerated, that allowed excessive force by officers. Okay, I'm saying aside from that. Aside from that. And the absence of training. Is there any other basis you're raising here? We're also, we have in cause of action number eight, we have a failure to screen claim. At this stage, we also believe that should proceed, Your Honor. This is a situation where TPD had in its possession records that Officer Shelby had been written up for pulling a butcher knife on her former partner. And there were records and information in TPD's system that would have been available to them. So we submit we've alleged a failure to screen claim on that basis. Is that a failure to screen with respect to her individual situation, though? Yes, Your Honor. Is there any other evidence of some custom or policy where a failure to screen in general, the officer's past history? No, Your Honor. We're not speaking to other officers specifically, but specifically— Isn't that a problem for your Monell claim, where you're relying on a single instance of a failure to screen? It just happens to be this failure. I understand the significance of that, but is that enough for a Monell claim? Your Honor, with respect to the failure to screen, we submit that it is sufficient because the city can be liable because it was in possession of information relevant to Officer Shelby and why she should not be hired. That sounds like a respondent superior claim. Why is the city responsible? Maybe some sergeant should have looked at this before the defendant was hired, but where is the city's involvement? It can't just be because one of their employees failed to do the job properly. It's got to be a city policy or something by, you know, if it was done by the chief of police and had not screened it, then you might have a claim. But where do you have something that makes the city liable other than essentially a respondent superior theory? Well, Your Honor, we submit that the allegations establish that the city had these records. The city was on notice of her criminal record, multiple orders of protection that would have put them on notice that she should not be hired. So that's the failure to screen claim. I'm happy to answer further questions or I could reserve my remaining time. What do you think? I'll reserve it then. Thank you, Your Honor. May it please the court. Good morning. My name is Scott Wood and I represent the defendant in this case, Betty Shelby. This case was decided by the district court on the second prong of the qualified immunity framework. The district court held that there was no case that the plaintiff put before the court that would have put Officer Shelby on notice that what she was doing in her encounter with Well, let me let me take issue with that. I mean, that is what the court decided, but the court decided it on the assumption that it was undisputed that Mr. Crutcher was his hand had come down and he was reaching in to the car. Let me ask you this. Is it clearly established that if Mr. Crutcher's hands were up that the officer could not shoot him? That's a yes or no question. That's what I would say. That is a yes. Yes, he could. She could not shoot him.  Okay, but the district court did not find he reached in. The second prong then is in a strictly intertwined in this case with whether we have a material dispute of fact of whether the hands were up or not. I don't think they disputed the fact that he lowered his left hand. They just did, and they did in their brief. Well, I think they said the window was up and he couldn't reach in. That was my reading. They said that his hands were up until he was shot under his right arm, and that even when he fell, his hands were still up. And that the frozen frame from the helicopter that has been enhanced, whatever that might mean and seems to me should be subject to cross-examination, it is taken three seconds after he was shot. So how can that resolve the dispute of where his hands were at the critical moment, which is the moment that they use lethal force? Well, that is a factual dispute, but- Well, and is it material? But here, they are bound by the facts as found by the court. They did not frame this appeal in terms of plain error. They did not allege plain error occurred. So their collateral attack on the facts found by Judge Malgren, the court doesn't have jurisdiction to hear that. No, Judge Malgren specifically said in his fact findings that it was disputed whether the window was up or down. It was disputed whether his hand was in or out. And then, unfortunately, it seemed as though even though he made those findings, which means we can't second guess that, that's in favor of the plaintiff, he then seems to forget that he's made that determination when he's looking at the clearly established prong. And I notice in your brief, you rely on that single fact, which is the hand going into the open window, to argue that it was not clearly established. And I don't believe you can rely on that. Actually, on appeal, I think we rely on the fact that he lowered his left arm, as found by the court. And that that can't be contradicted because of what the video shows. But you spoke of plain error. Plain error has nothing to do with summary judgment. This is a decision on summary judgment. The question is, is there sufficient evidence for a reasonable person to view it differently? Right. And that's what it's all that Judge McHugh and Judge Moritz have been focusing on. My understanding of the framework of appeals of this sort to this court is that before you're going to collaterally attack the facts, as found by the judge, you have to- The judge can't find disputed facts in a summary judgment motion. He can't- Judges don't find facts on summary judgment. They're either disputed or they're undisputed. And if they're disputed and they're material, you can't grant summary judgment. That set of facts found by Judge Malgrim was adequate in this case, and supported by the evidence. And those things that are in his list were not contradicted by the plaintiff at the district court level. Let me suggest what might be causing the confusion. Most of our qualified, or a lot of our qualified immunity cases come up on interlocutory appeal when the judge has denied qualified immunity and the officer appeals. In that circumstance, if the judge says there's a factual dispute about this and I'm making this finding, we're stuck with that. We can't second guess the judge and say, no, there wasn't sufficient evidence for that. That's not our standard after there's a judgment. This isn't an interlocutory appeal. This is an appeal after final judgment. And then we're reviewing a summary judgment. And the judge, anything the judge says about the facts, we review de novo. It's not clear error. We're not even deferential to the district court on that. I think you're missing that. Well, Your Honor, I understand exactly what you're saying. I do. But in the qualified immunity framework, they have failed completely to bring forth any case that would put Officer Shelby on notice that what occurred was a violation of Mr. Crutcher's law. I thought you acknowledged it under Judge McHugh's assessment of the possible findings by a jury that they could find that he had his hands up when he was shot. He wasn't reaching in the window. And if that's possible, we've got plenty of cases saying you can't shoot somebody in that circumstance. May I add another possibility, too? I think it's blatantly contradicted by the record. Because you can hear the gunshot on the dash camera video that was present and see that we, I think one of our exhibits was a synced up version that shows the dash camera along with the helicopter camera. So we hear the gunshot and the taser is fired simultaneously. And that gunshot, the video from the helicopter shows that when the gunshot was fired, before the sound of the gunshot, the deceased had his hand in the window. Is that what you're saying? You can tell it's lowered. And is that synchronization disputed at all? I don't believe it was. I think it's not disputed that his hand was lowered. It's whether or not it went into the window. OK. Well, it's also, oh, I'm sorry. Let me just ask one thing. OK. There's another issue here. I don't know if it's been adequately broached, but you can't just shoot somebody without warning. And it seems to me that before you shoot somebody because he's reaching his hand toward the window and you say, don't touch that window, don't put your arm in there, nothing like that happened. And it seems to me, given how you have to struggle to reach in and get a gun if it's there, there was adequate time for the officer to give that kind of warning. My understanding is that the 10th Circuit is a totality of the circumstances circuit versus... We have lots of cases saying you need to warn. If there's adequate time, you need to warn before you fire. Do you dispute that? No. She did not have time to warn him because the hand coming down is what triggered her fear that he was possibly reaching for a gun. And if you add up all the things that happened from her initial encounter with him when she saw him up at 36th Street North and came to the assumption or finding that was later confirmed by a drug test that he was high on PCP, all the way through her encounter when she first starts giving him commands, 88 seconds of noncompliance, him going back to his car at gunpoint with his hands raised in the air, and then turning and looking at her and lowering his hand. I will agree it's disputed. They dispute that the window was down as we climb. But the court found that those facts that he set forth in his opinion were enough to sustain a motion for summary judgment based on the second prong of qualified immunity. And I think I'm sorry I've gone way too long. Well, you have some time left. You don't have to use the time. Okay. Well, I have the city's attorney. This is going up. I thought it shows in red when that happens. No, the city's attorney. It's the city attorney's turn. Oh. Yeah. I'm sorry. My fault. All right. So I yield the rest of my time to Mr. Hendrickson. Okay. Thank you. I think you'll have enough time. You should stop them while they're. Well, give them five. Just make it five minutes.  Thank you, Your Honor. Good morning. Jeffrey Hendrickson for the city of Tulsa. And may it please the court. Your Honor, for the portion of this appeal relevant to the city of Tulsa, I will be addressing the Monell claims only. And I feel I need to urge that the discussion that's been had so far is about evidence that was developed in the case after the city was dismissed from the lawsuit. And so the focus of the component of the case against the city has to do with what was pledged against the city by the estate in the complaint seriatim, ultimately concluding in the fourth amended complaint. This case is, as to the city, relatively straightforward. It is an application of the principles that are well known from Bell Atlantic Corp v. Twombly and Ashcroft v. Iqbal. Those require that federal rule civil procedure 8A, short and plain statement, contains, when you plead, facts that are sufficient to raise a claim to a level of plausibility. The estate, in this case, the appellant, did not do so for any of the Monell claims that were made against the city. I want to pick up on two in particular that I think are maybe of most relevance. My friends on the other side argued generally for a custom or practice in the city of using excessive force as their basis for asserting a Monell claim that could proceed into discovery. As the briefing suggests and as the fourth amended complaint suggests, this might be a generic reference to an informal policy or custom. It is important to note that if your claim is that a municipality violated your constitutional rights because they had an informal policy or custom of doing so, there must be allegations that there was a practice that was widespread, and it was permanent, and it was so widespread and permanent as to constitute a well-settled custom or usage or something that the city does normally. The fourth amended complaint contains no allegations whatsoever of anything prior to this event, prior to what we're talking about in September of 2016, that would constitute a well-settled practice, informal practice, that leads to constitutional violations of the nature that are being alleged against Officer Shelby here. I want to move to the failure to supervise or failure to train Officer Shelby component as well. There was a fair amount of discussion about that when my friends on the other side were here articulating what their argument was as to why the city should be liable for failing to train or supervise Officer Shelby. One thing that wasn't discussed at length was the standard that the appellant had to satisfy when it came to what they had to plead, and that was having to plead facts that show that the city was deliberately indifferent to the need for more or training at all to show that Officer Shelby had done something wrong. And there was little to no discussion of that standard. And I think that's probably understandable because to assert that a municipality was deliberately indifferent to a lack of training that led to a constitutional violation, appellant was obligated by Twombly and Eggball and the substantive standards of the Monell claim to allege facts that show that the city was on notice well before the events in question that this was an area in which more training was needed. And the fact is the Fourth Amendment complaint does not contain a single specific factual allegation that the city would have been on notice that there was a deficiency in training in this regard. Is it enough that this particular officer had some things in her past that suggested maybe some anger management issues? Judge McHugh, no, it is not enough. And that is because that failure to screen claim is a very particular claim that, as the court has already indicated, can easily sound in respondeat superior. I want to direct the court to a description from the Supreme Court of what needs to be shown for a failure to screen claim. This is from Bryan County v. Brown, 520 U.S. 397. And in Bryan County, the Supreme Court notes that when an allegation is premised on a failure to screen, a finding of culpability, I'm reading from this, simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff, and the connection between the background of the particular applicant and the specific constitutional violation must be strong. What was alleged in the Fourth Amendment complaint about Officer Shelby's background had to do with an issue of domestic violence. That is alleged. It had to do with using a shovel to strike a vehicle. But those allegations were years before what happened here, and had nothing to do with Officer Shelby using force in a split-second decision that is obviously much discussed. So as to the failure to screen claim, no, based purely on Officer Shelby's actions. Your Honor, may I make one more point and then conclude? With respect to the equal protection claim that is also a part of the plaintiff's case, or the appellant's case, in the Fourth Amendment complaint, there are no allegations of fact that assert that Officer Shelby herself acted with a discriminatory purpose. And that was something that the appellant had to plead in order to advance beyond where they were at. We urge the court to affirm the order of the district court. Thank you. Thank you, Your Honor. Just a few responsive points. First is that we have always maintained that Terence Crutcher was shot with his hands up. That's in our briefs. That was our position in the lower court. And of course, as Your Honor indicated, this court has de novo review and a responsibility to view the facts in our favor. The height of the window is a disputed fact as well, and that's clearly laid out in our  We address that in the reply brief at page four, and also in our opening brief at page 34. But what's critical there is that the parties are pointing to two different photographs of this window where it is at different heights. The photograph that we point to is a still image taken from the helicopter video. That's in the appendix at 434. It shows that streak of blood down the window, down the door, and Mr. Crutcher lying on the pavement with his hands above his head in the moments after he was shot. The other side urges the court to credit a different still photograph of the window. This is a photograph, though, that was taken at a later time when the vehicle was back in police custody. The window has been cleaned of blood. We don't know, based on the record, when that photo was taken, but the window does appear to have been substantially lowered from its prior position. So that's a real material factual dispute as well. With respect to the Monell claims, Your Honor, I'd make a few points. First, on Bryan County, we address this in our briefs, but that case does address the standard of proof required after a trial. Here, we're asking the court to allow us some discovery to further explore these claims. We would ask the court to also look at Aston versus City of Boulder, where a similar claim of a custom and practice of excessive force was alleged. That's 652F2D188. That's in the District of Colorado, a 2009 case. And with respect to the city's knowledge and need to address systemic deficiencies in the police department, in our brief, we've also pointed to the officer's statement. She speaks about how her training justified her use of force against Mr. Crutcher and that that was what we were taught to do. We do think that that statement and other allegations in the complaint support that the Tulsa Police Department was on notice of systemic issues. Thank you, Counsel. Thank you, Your Honor. Thank you, Counsel. Case is submitted. Counselor, excused.